## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | | |
|---|---|---|
| J. D. LONG, | : | CIVIL ACTION NO. |
| Plaintiff, | : | 2:11-CV-00294-RWS-JCF |
| | : | |
| v. | : | |
| | : | |
| DANE KIRBY, et al., | : | PRISONER CIVIL RIGHTS |
| Defendants. | : | 42 U.S.C. § 1983 |

### MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Plaintiff, a former pretrial detainee at the Fannin County Detention Center ("FCDC"), alleges in this counseled 42 U.S.C. § 1983 action that the following Defendants were deliberately indifferent to his serious medical needs: (1) Fannin County Sheriff Dane Kirby, (2) FCDC Chief Jailer Greg Newman, (3) FCDC Shift Sergeant Jack Queen, (4) Registered Nurse Ann Evans, and (5) Nurse Practitioner Michael McMunn.  (Docs. 21-2 at 1-3, 21-3 at 4-13; *see* Docs. 33, 37).  Defendants Evans and McMunn (the "Medical Defendants") have filed a joint Motion for Summary Judgment (Doc. 63), as have Defendants Kirby, Newman and Queen (the "Sheriff's Office Defendants") (Doc. 64).

### I.    Summary Judgment Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(a). "[Former] Rule 56(c) [now Rule 56(a)] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When considering a summary judgment motion, a court must "view the evidence and all factual inferences therefrom in the light most favorable" to the non-movant. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible." *Cuesta v. Sch. Bd. of Miami-Dade Cnty.*, 285 F.3d 962, 970 (11th Cir. 2002) (internal quotations omitted). Morever, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted); *see Pollinger v. IRS Oversight Bd.*, 362 Fed. Appx. 5, 12 (11th Cir. 2010) ("Summary judgment is proper

2

if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. '[C]onclusory allegations without specific supporting facts have no probative value' and a party opposing summary judgment must set forth 'specific facts to show why there is an issue for trial.' " (citations omitted) (quoting *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000))).

The movant bears the initial burden of demonstrating that summary judgment is warranted. *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir. 1990). The movant may do so by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Once the movant has properly supported the summary judgment motion, the non-movant then must "come forward with specific facts showing that there is a *genuine issue for trial*," i.e., that the evidence is sufficient to support a jury verdict in the non-movant's favor. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (internal quotations omitted); *see also Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) (stating that "non-moving party must come forward with *significant, probative evidence*" (emphasis added)). "[C]onclusory assertions . . . [without] supporting evidence are insufficient to withstand summary judgment." *Holifield v. Reno*, 115 F.3d 1555, 1564

n.6 (11th Cir. 1997); *see also McKeithen v. Jackson*, 3:11-CV-00190-WHA, 2013 U.S. Dist. LEXIS 182436, at *8 (M.D. Ala. Dec. 5, 2013) (noting that "when a plaintiff fails to set forth specific facts *supported by requisite evidence* sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party" (emphasis added)), *adopted by* 2014 U.S. Dist. LEXIS 729 (M.D. Ala. Jan. 6, 2014).

A motion for summary judgment may be supported or opposed with the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "As a general rule, the court may consider on a Rule 56 summary judgment motion any material that would be admissible or usable at trial." *Prop. Mgmt. & Invs., Inc. v. Lewis*, 752 F.2d 599, 604 n.4 (11th Cir. 1985) (assuming without deciding "that authenticity and completeness are among the evidentiary requirements of Rule 56"); *see also Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) (stating that court "may consider only . . . evidence [that] can be reduced to an admissible form," and noting that "evidence that is otherwise admissible may be accepted in an inadmissible form at summary judgment

4

stage," but that hearsay generally cannot "be reduced to admissible form").

## II.   **Discussion**

### A.   **Deliberate Indifference To A Serious Medical Need**

To prevail on a claim for relief under 42 U.S.C. § 1983, a plaintiff must establish that an act or omission committed by a person acting under color of state law deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States. *See Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995). The Eighth Amendment prohibits indifference to a convicted prisoner's serious medical needs so deliberate that it "constitutes the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotations omitted).[1] "To prevail on a claim of deliberate indifference, a plaintiff must show: (1) a serious medical need; (2) defendant's deliberate indifference to that need; and (3) causation between the defendant's indifference and the plaintiff's injury." *McDaniels v. Lee*, 405 Fed. Appx. 456, 458 (11th Cir. 2010) (citing *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009)). "A 'serious medical need' is one that is diagnosed by a physician

---

[1]The Fourteenth Amendment prohibits deliberate indifference to a pre-trial detainee's serious medical needs. *Cook v. Sheriff of Monroe County*, 402 F.3d 1092, 1115 (11th Cir. 2005); *see Hamm v. De Kalb County*, 774 F.2d 1567, 1574 (11th Cir. 1985) (noting that standard for determining deliberate indifference is the same under the Eighth and Fourteenth Amendments).

as requiring treatment or one that is so obvious that a lay person would recognize the need for medical treatment." *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1317 (11th Cir. 2010) (internal quotations omitted). "To satisfy the subjective element of [a] deliberate indifference [claim, a] . . . Plaintiff must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (internal quotations omitted) (noting that subjective knowledge requires that defendant " 'must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* [] must also draw the inference' " (quoting *Farmer*, 114 S. Ct. at 1979 (emphasis added in quoted material)); *see also Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010).

> Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (internal quotation marks omitted). "[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual Defendant must be judged separately and on the basis of what that person knows." *Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1234

6

(11th Cir. 2010) (internal quotations omitted) (noting that "even if . . . Defendants [knew of Plaintiff's] history of alcoholism and/or past alcohol-related arrests, they would still have needed to know that [he] was in serious need of medical attention during the time period in question").

"A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness." *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999) (noting that "prison officials may violate the Eighth Amendment's commands by failing to treat an inmate's pain").

> In determining whether a delay in treatment rises to the level of deliberate indifference, relevant factors include: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert*, 510 F.3d at 1327. The question of whether a delay in receiving treatment worsened an individual's condition overlaps with the causation inquiry. *Id.* at 1329. To survive summary judgment, a plaintiff must show that the delay attributable to the defendant's indifference likely caused the plaintiff's injury. *Id.* "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill v. DeKalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n.9 (2002).

7

*Lee*, 405 Fed. Appx. at 458-59.

Negligence, even rising to the level of medical malpractice, does not constitute deliberate indifference. *McElligott*, 182 F.3d at 1254; *see also Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999) (noting that it is well-settled that "medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for deliberate indifference"), *amended by* 205 F.3d 1264 (11th Cir. 2000); *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995) (noting that "[m]ere negligence in diagnosing or treating a medical condition is an insufficient basis" for a deliberate indifference claim).

Nor does a simple disagreement over a diagnosis or course of treatment constitute deliberate indifference.  As long as the medical treatment provided is "minimally adequate," a prisoner's preference for a different treatment does not give rise to a constitutional claim.  *See Harris v. Thigpen*, 941 F.2d 1495, 1504-05 (11th Cir. 1991); *see also Adams*, 61 F.3d at 1547 (concluding that the medical provider's "failure to administer stronger medication" to a prisoner who subsequently died was "a medical judgment and, therefore, an inappropriate basis for imposing liability under section 1983"); *Harris v. Leder*, No. 12-12098, 2013 U.S. App. LEXIS 10485, at *13 (11th Cir. May 24, 2013) (" 'Federal and state governments . . . have a constitutional

8

obligation to provide minimally adequate medical care to those whom they are punishing by incarceration.' " (quoting *Thigpen*, 941 F.2d at 1504)).

## B.   <u>Factual Background</u>

Plaintiff was a pre-trial detainee at the FCDC from September 16 to November 11, 2010 and from March 29 to October 7, 2011.  (Doc. 21-2 ¶ 1).  At all times relevant, Nurse Evans and Nurse Practitioner McMunn provided medical services to Plaintiff as employees of Southern Health Partners, Inc. ("SHP").  Nurse Evans was the medical team administrator at the FCDC.  (Doc. 63-7 ¶¶ 1-7; *see also* Doc. 81 ¶¶ 1-7).  Plaintiff asserts in his amended complaint that he suffered from numerous medical conditions both before and during his FCDC detention, "including but not limited to" the following ailments:

> prostate problems, bleeding ulcers, two hernias (one abdominal and one inguinal), blinding migraine headaches, gout, kidney stones, memory loss, and back and neck problems particularly a deteriorated disk at L-4, which requires periodic injections of anti-inflammatory drugs and which virtually paralyzes Plaintiff when his "back goes out").  Plaintiff is also highly allergic to the following substances, which cause [him] severe allergic reactions and sometimes anaphylactic shock: peanuts, peanut butter, monosodium glutamate (or MSG), pesticides, insecticides, most cleaning fluids and supplies (including Clorox), air fresheners, mold, mildew, dust, shaving lotions, perfumes, deodorants, most soaps (except Ivory), scented aerosol sprays, pollens, evergreens, dairy products (Plaintiff is lactose intolerant), and many medications.

(Doc. 21-2 ¶ 13).  Plaintiff claims that as a result of the deliberately indifferent medical care that he received at the FCDC, he suffered from the following conditions during his FCDC detention and upon his release:

> loss of 30 pounds, increased and untreated high blood pressure, constant rash on his body and limbs, the increasing frequency [of] his recurring and severe bouts with back pain (which rendered him unable to walk or stand for 3-to-7 day stretches), more frequent allergic reactions to Jail-supplied foods and medicines, increasingly frequent migraine headaches, more frequent anxiety attacks and longer, more frequent bouts with severe depression and emotional stress.

(Doc. 21-3 ¶ 41).

### C.     Plaintiff's Allegations That He Was Denied Needed Medications Fail To State A Genuine Issue For Trial.

#### 1.     Plaintiff's Allegations Regarding His Medications

In his amended complaint, Plaintiff alleges the following:

(1)    "[o]n August 9, 2011, Jailers did not give Plaintiff his stomach medicine with his nightly pills, and [he] was up all night nauseous and vomiting as a result" (*id.* ¶ 22);

(2)    on August 10, he did not receive either his stomach medicine or his blood pressure medicine because the prescription medicine provided by Plaintiff's family had run out without Jailers notifying his family (*id.* ¶ 23);

(3)    on August 19, McMunn ordered all of the subscription medications for Plaintiff and two other inmates either changed or discontinued (*id.* ¶ 24), ostensibly because Plaintiff and one of the other inmates had a legal action pending against Fannin County or had sued Fannin County in the past (*id.* ¶ 25);

10

(4)     on September 14, he was given another inmate's medications "by a Jailer named Petty" (*id.* ¶ 35);

(5)     on September 18, due to his severe back pain, he was unable to stand for showering but was denied a wheelchair or shower chair to use while showering (Doc. 21-3 ¶ 38);

(6)     on September 23, after he took a bite of a "Hot Fry," a seasoned french fry offered to him by a fellow inmate, he had a severe allergic reaction, but Evans ordered Sergeant Burrell not to give Plaintiff Benadryl right away, at which point Burrell took it upon himself to give Plaintiff Benadryl when he observed Plaintiff with a rash over his body and limbs, swollen lips, and gasping for breath—Plaintiff contends the Benadryl prevented him from going into anaphylactic shock and possibly dying (*id.* ¶ 39).

In his Consolidated Response to Defendants' Motions for Summary Judgment

("Consolidated Response") (Doc. 78), Plaintiff alleges other problems concerning the

medications he received while at the FCDC:

(7)     he was sick for nine days from an allergic reaction to the detoxification medication he received upon his intake to the FCDC on September 16, 2010 (*id.* at 5);

(8)     on at least three occasions he "was given the wrong or substitute medication" (*id.* at 8);

(9)     Evans denied him Benadryl on two separate occasions: (a) when he had a panic attack upon discovering cleaning fluid had been sprayed in his bed and cell (*id.* at 11); and (b) when he "had a reaction to some of the food," presumably the Hot Fry noted above, and Evans "instructed Burrell to sit Plaintiff up front for an hour, but not to give him Benadryl" (*id.* at 20);

(10)    even after Sheriff Kirby intervened to allow Plaintiff's sister to bring him Orajel

11

for "a cancer [he had] taken off the side of his mouth. . . . Queen refused to allow Plaintiff to have the medication for several days, until further complaints by Plaintiff" (*id.* at 12);

(11)    because none of Plaintiff's prescriptions were on the FCDC formulary list, his wife purchased his prescription medication and brought it to the Jail, but Plaintiff "was not always allowed to receive it" because "Evans or McMunn would substitute medication" (*id.* at 14);

(12)    on one occasion "Plaintiff was denied his medication because the deputies chart showed that he had been given the pain medication," although later he "got permission to [take] the medication his family had brought in the night before" (*id.*);

(13)    Evans or McMunn would change Plaintiff's medications without telling him and Plaintiff was threatened with isolation when he refused to take the unknown medications (*id.* at 14-15);

(14)    it was always necessary for Plaintiff's wife to provide his blood pressure medication because the Sheriff's Department would not do so (*id.* at 15);

(15)    Plaintiff's blood pressure medication ran out more than once, including one time for three days (*id.* at 15-16);[2]

(16)    after one of Plaintiff's trips to the hospital, he was told that it would take 30 days to get the Robaxin, Demerol and Phenergan prescribed by the attending hospital physician, Dr. Turner, and after his wife brought the medications to the FCDC, Queen would not allow Plaintiff to have them and McMunn told Plaintiff that "he could not have the medication" (*id.* at 16-17, 22-23);

---

[2]Plaintiff states that when he "does not get his blood pressure medication, or the proper dosage, he suffers migraine headaches, sensitivity to sound, inability to stand up, and moving as in a drunken state." (Doc. 78 at 16). In his deposition, he testified that he "was miserable," "had a headache, a nose bleed," and he was "dizzy" and "[c]ouldn't stand up." (Pl.'s Dep. at 100 (Doc. 69-2 at 17)).

12

(17)    after a separate hospital trip, he was denied the two medications prescribed for him there, and the prescriptions were not shown to his wife to enable her to fill them (*id.* at 19);

(18)    Plaintiff's "back would go out several times [at the FCDC] and he would have to literally beg for pain medication," and he was denied a shower chair for several days when his back pain prevented him from standing (*id.* at 19-20).

## 2.    Undisputed Facts Regarding Plaintiff's Medications

In their Statement of Undisputed Material Facts (Doc. 63-7), the Medical Defendants state that on March 29, 2011, when Plaintiff returned to the FCDC after his release in November 2010, he brought with him the following medications: "Fluticasone (Flonase), Albuterol Inhaler, Ventolin Inhaler, Diovan 80/12.5 (20 tablets), Pepcid (37 tablets), and Lisinopril 20 (angiotensin-converting enzyme inhibitor for hypertension, 26 tablets)." (*Id.* ¶ 12). Plaintiff admits that this is correct.[3] (Doc. 81 ¶ 12). The Medical Defendants also state that Plaintiff was treated for, and when appropriate provided medication for, a series of complaints, including "allergies that caused a headache and sore throat" on July 18, 2011; "problems taking" his newly prescribed allergy medication and complaints of low back pain on July 20, for which Evans prescribed Ibuprofen 400 mg; "gout and left great toe pain" on August 3;

---

[3]In his Consolidated Response, Plaintiff states that "[h]e was on the following prescription medication[:] Diovan, Toprol, Norvase, Ativan, Demerol, and Pep[c]id." (Doc. 78 at 3).

13

recurring gout and left toe and knee pain on August 19, for which he received "Allopurinol 300mg (treatment for gout or kidney stones, by decreasing uric acid levels in the blood) by mouth twice a day for 30 days"; and food allergies on August 22, for which he was being treated "with Pepcid, a medication used to treat acid-reflux" and "a bland diet." (Doc. 63-7 ¶¶ 23-25, 29-31). Plaintiff does not dispute these statements. (Doc. 81 ¶¶ 23-25, 29-31).

The Medical Defendants state that on September 18, 2010, Plaintiff "complained of chest pain, pressure, and tightness" and he was transported to Fannin County Regional Hospital ("FCRH") for evaluation. He "was diagnosed with atypical chest pain, anxiousness, and abdominal pain. He was treated with Levsin . . . for irritable bowel[] and released back to the" FCDC. (Doc. 63-7 ¶ 9). Plaintiff does not dispute this statement. (Doc. 81 ¶ 9).

### 3.   Disputed Facts Regarding Plaintiff's Medications

The Medical Defendants state that when Plaintiff's Diovan blood pressure medicine ran out on April 15, 2011, the FCDC doctor prescribed hydrochlorothiazide ("HCTZ") to replace it and Zantac to replace Plaintiff's Pepcid, and Plaintiff "continued with these replacement medications through June 2011 without complications." (Doc. 63-7 ¶ 13). Plaintiff denies this (Doc. 81 ¶ 13) and alleges in

14

his amended complaint that in June 2011 "the Jailers" substituted for his prescribed blood pressure medicine, Diovan, "for which there is no generic substitute," a cheaper medication that not only did not work but caused an allergic reaction.  (Doc. 21-2 ¶¶ 17-19).   Plaintiff alleges that Newman and Queen "sadistically denied Plaintiff Benadryl and allowed . . . Plaintiff to break out in hives, to have alternating cold chills and hot sweats, to hyperventilate and to suffer great difficulty in breathing. . . . [and] Evans told Plaintiff that the Jail doctors did not authorize giving him Benadryl."  (*Id.* ¶ 18).

The Medical Defendants state that Plaintiff "was also seen for complaints of neck pain, upper body rash, stomach pain, prostatitis, dizziness, back pain, and irritable bowel.  He was treated without further complaints with Benadryl 25mg twice a day (for rash), Levsin Cipro 500mg (antibiotic) for prostatitis, and Naprosyn (Aleve) 250mg for pain."  (Doc. 63-7 ¶ 11).  Plaintiff denies this statement.  (Doc. 81 ¶ 11). The Medical Defendants also state that in July 2011 Plaintiff received "the following medications: Diovan, Pepcid, Cipro, Prazosin, Chlor-Trimeton, Claritin, Ibuprofen and Flonase"; and in August 2011 he received "Diovan, Pepcid, Prazosin, Indocin, Allopurinol, Claritin, and Ibuprofen."  (Doc. 63-7 ¶¶ 28, 33).  Plaintiff denies these statements as well.  (Doc. 81 ¶¶ 28, 33).

15

4.   <u>Analysis</u>

The medical records submitted by the Medical Defendants for the most part belie Plaintiff's contention that he was denied needed medication out of deliberate indifference to his serious medical needs.  (*See generally* Docs. 71-1 *et seq.*).  The Medication Administration Sheet for September 16 to November 11, 2010 shows that Plaintiff received his own personal blood pressure medication, Diovan/HCTZ, during the entire duration of that two-month stay at the FCDC.  (Doc. 71-1 at 23-25).  Plaintiff also received Pepcid, Dilantin, Clonidine, Levsin, Cipro, Naprosyn and Benadryl, among other medications, as needed.  (*See id.*).  When Plaintiff returned to the FCDC at the end of March 2011, he was given the Diovan he brought with him until it ran out in April, at which time he was switched to Lisiniprol/HCTZ daily until the middle of June, when his family brought his Diovan/HCTZ and he resumed taking that blood pressure medication, which he received daily until his release in October 2011.  (Doc. 71-2 at 44-52).  Plaintiff also received either Zantac or Pepcid for his gastrointestinal problems throughout his March to October 2011 stay.  (*See id.*).  He received Robaxin, Ultram, and Prednisone as prescribed in June 2011; Ibuprofen, Cipro, Allopurinal, Naprosyn, and Prazosin at different times; and Prednisone and Robaxin briefly in September 2011.  (*See id.*).

16

To the extent that Plaintiff from time to time missed receiving one or more of his many medications due to inadvertence, mis-communication or mistake, these alleged incidents do not rise to the level of deliberate indifference to a serious medical need.  In *Williams v. Arnold*, 207 Fed. Appx. 980 (11th Cir. 2006), for example, the Eleventh Circuit considered the deliberate indifference claims of a prisoner whose

> medical regimen consisted of multiple prescription medications that he took several times a day.  His evidence shows that he sometimes missed a day or more of his medicine because the jail's staff failed to refill his prescriptions before he ran out of medicine.  He had all of his medication more that 92 percent of the time he was in [the] jail.  The longest time he went without his medication was one seven-day period, and even then he received a physician's care and suffered no lasting physical harm from the delay.

*Id.* at 985.  The Eleventh Circuit affirmed summary judgment in favor of the sheriff and chief jailer because the plaintiff "offered no evidence that either [defendant] acted with deliberate indifference."  *Id.* (noting that "the cause of the delays was failure by the jail's staff to retrieve [plaintiff's] refills before [he] ran out of medicine[, but] the jail's overall effort in keeping up with [plaintiff's] four prescriptions . . . was reasonable[,]" and quoting *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989), to the effect that "[W]hen a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation."); *see also McDaniels v. Lee*, CV 108-110, 2009

17

U.S. Dist. LEXIS 120366, at *25-26 (S.D. Ga. Oct. 27) (rejecting plaintiff's argument that defendant "treated him with deliberate indifference because the Medication Administration Reports [indicate] that Plaintiff missed medications," and concluding that plaintiff's "claim for deliberate indifference . . . fails [in part] because the record does not contain verifying medical evidence to establish a detrimental effect from any purported delay in medical treatment"), *adopted by* 2009 U.S. Dist. LEXIS 120378 (S.D. Ga. Dec. 28, 2009).

McMunn's alleged order to stop giving Plaintiff his prescribed pain medication after his return from the hospital in the mid-September 2011, however, presents a closer question. The Eleventh Circuit has explained that

> [i]n *Estelle*, the Supreme Court recognized that the Eighth Amendment requires the government "to provide medical care for those whom it is punishing by incarceration" precisely because the failure to do so "may result in pain and suffering which no one suggests would serve any penological purpose." *Estelle*, 429 U.S. at 103.
>
> Our cases, too, have recognized that prison officials may violate the Eighth Amendment's commands by failing to treat an inmate's pain. In *Brown v. Hughes*, 894 F.2d 1533 (11th Cir. 1990), we recognized that the delay of a few hours in treating an inmate's broken foot could constitute a violation of the Eighth Amendment, holding that the failure to treat the pain from a broken foot, even for a few hours, was a constitutionally cognizable injury. "With this type of injury, it may be that deliberately indifferent delay, no matter how brief, would render defendants liable as if they had inflicted the pain themselves. Deliberately inflicted pain . . .

18

does not become unimportant and unactionable under the eighth amendment simply because the pain produced is only momentary." *Id.* at 1538; *Washington v. Dugger*, 860 F.2d 1018, 1021 (11th Cir. 1988) (reversing grant of summary judgment to prison officials on inmate's claim that delay in providing treatments that "eliminated pain and suffering at least temporarily" constituted deliberate indifference); *Aldridge v. Montgomery*, 753 F.2d 970, 972-73 (11th Cir. 1985) (reversing directed verdict to officers who failed to provide ice pack and aspirin for pain caused by bleeding cut); *see also Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999) (reversing grant of summary judgment to prison guard who failed to provide pain medication to inmate); *Boretti v. Wiscomb*, 930 F.2d 1150, 1154-55 (6th Cir. 1991) (recognizing that "a prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering.").

*McElligott*, 182 F.3d at 1257 (citation altered).

Despite McMunn's actions in terminating Plaintiff's medications in September 2011, those actions do not constitute deliberate indifference to Plaintiff's serious medical needs because there is no evidence that Plaintiff's back pain constituted a serious medical need. *See Bowden v. Fauquier*, 5:11-CV-437-MTT-MSH, 2012 U.S. Dist. LEXIS 157697, at *12 (M.D. Ga. Oct. 5) (because plaintiff "failed to provide any evidence, other than his own claims, that his injuries were as severe as he claimed," he "failed to meet the first prong of [*McElligott's*] deliberate indifference standard"), *adopted by* 2012 U.S. Dist. LEXIS 156444 (M.D. Ga. Nov. 1, 2012); *see also Sanks v. Franklin*, 4:09-CV-87-CDL-GMF, 2009 U.S. Dist. LEXIS 123078, at *19 (M.D. Ga.

19

Nov. 17, 2009) (concluding that stomach ache was not serious medical need and citing with approval *Burley v. Upton*, 257 Fed. Appx. 207, 210 (11th Cir. 2007), wherein the Eleventh Circuit concluded that "lower back pain is not the type of serious condition this circuit requires," and *Sledge v. Kooi*, 564 F.3d 105, 107 (2d Cir. 2009), wherein the Second Circuit found that "plaintiff's eczema, back pain, various stomach disorders, allergies, and asthma did not constitute serious medical needs"), *adopted by* 2010 U.S. Dist. LEXIS 2594 (M.D. Ga. Jan. 13, 2010).

Plaintiff's medical records that pre-date his September 2010 FCDC detention include a radiology report dated July 30, 2010 in which the attending physician found "no evidence of acute pathology or thoracic disc herniation," but instead found only "multilevel degenerative disc disease[,] spondylosis" and "mild scoliosis," but "no subluxation," no complications and a normal "bone marrow signal." (Doc. 71-6 at 1, 3). The report identified "no fracture" and "no evidence of any disc herniation or spinal stenosis," with a "thoracic spinal cord [that] was normal in appearance." (*Id.*) The report noted that Plaintiff's "loss of normal curvature suggests muscle spasm." (*Id.* at 1).[4]

---

[4]The records from Plaintiff's January 25, 2006 hospital visit indicate that he suffered at that time from a large gastric ulcer. (*See* Doc. 71-7 at 1, 5).

AO 72A
(Rev.8/82)

Likewise, the notes compiled by Dr. Suzanne Turner at FCRH during Plaintiff's visit on September 10, 2011 suggest that while Plaintiff's back may have been painful to him, it did not constitute a serious medical need.  The notes indicate that although Plaintiff complained of lower back pain, he was "in no acute distress." (Doc. 71-8 at 46).  Dr. Turner noted that Plaintiff's "condition was non-emergent," and she prescribed Robaxin four times daily "as need for muscular pain, spasm"; Ultram once every six hours "as needed for pain"; and prednisone twice daily.  (*Id.* at 47, 57).  It was noted at the time of discharge that Plaintiff's pain had lessened.  (*Id.* at 49). Robaxin "is used as a muscle relaxant"; Ultram, which "can be habit-forming," "is used to relieve moderate to severe pain"; and Prednisone "is used in the treatment of inflammatory diseases and allergic reactions." (*Id.* at 54-56).

To the extent that Plaintiff has raised a claim regarding the detoxification he experienced upon his intake into the FCDC in September 2010, the undisputed medical records indicate that Plaintiff took the detoxification medication for at most three days, September 17-19, 2010, and then signed a form on September 20 refusing the medication because "I don't need them.  I don't take my meds that often." (*See* Doc. 71-1 at 4, 6, 16, 19).  And, as noted above, *see* Sect. II. C. 2., when he was taken to FCRH on September 18, 2010, he complained of a mild neck injury, chest pain, and

21

right inguinal pain (*see* Doc. 71-8 at 23, 25), was diagnosed with atypical chest pain (i.e., pain unrelated to his heart) and abdominal pain (*id.* at 20-21), was observed to be anxious (*id.* at 25), and was prescribed Levsin, which "is used in the treatment of stomach disorders such as ulcers, nausea, and cramping" (*id.* at 22, 24). The attending physician's impression was that Plaintiff had atypical chest pain and pain of "unknown etiology." (*Id.* at 29). These minor ailments do not rise to the level of a serious medical need and, moreover, Plaintiff received the prescribed Levsin upon his return to the FCDC. (*See* Doc. 71-1 at 23-24).[5]

> **D.** **Plaintiff's Allegations Regarding His Receiving Delayed Or No Treatment For His Back And Kidney Stone Problems And Being Required To Agree To Pay For His Hospital Visits Before Being Taken For Emergency Treatment Fail To State A Genuine Issue For Trial.**

> **1.** **Plaintiff's June 17, 2011 Visit To FCRH For Back Pain**

In Plaintiff's amended complaint, he alleges that on June 17, 2011 his back "went out," but he received no medical treatment and lay "in the floor moaning for

---

[5]Plaintiff's claim regarding his inability to shower for several days fails to rise to the level of a constitutional violation. *See Ellis v. Pierce County*, 415 Fed. Appx. 215, 218 (11th Cir. 2011) (reversing denial of summary judgment to defendants on plaintiff's claim that "he was 'denied access to showers for up to fourteen days at a time' " because "in his deposition Plaintiff admitted that these two-week periods between showers only occurred 'several times' over the course of his fifteen-month detention. He usually had to wait only three to four days for a shower. The delays that Plaintiff has presented do not amount to a wanton and unnecessary infliction of pain." (internal quotations omitted)).

22

several hours" before he was transported to FCRH in a patrol car, but "only after the Sheriff, Captain Greg Newman (Chief Jailer) and the on-duty Jailer demanded that Plaintiff pay for his own medical care."  (Doc. 21-2 ¶ 14; *see* Doc. 78 at 7-8, 10, 19).

The Medical Defendants state that on Friday, June 17, Evans received a telephone message recorded by Queen on June 16 "regarding [Plaintiff's] complaint of 'throwing [his] back out' " and Plaintiff "was treated with Tylenol 500mg, 2 tablets every 6 hours as needed for pain."  (Doc. 63-7 ¶ 17).  Evans then received a call from Newman informing her that Plaintiff wanted to go to the emergency room for pain. Plaintiff was taken to the hospital and treated for low back pain, "prescribed Ultra[m], Robaxin, and medical dose pack [and] treated with Ultram 50mg by mouth twice a day, Robaxin 750 mg by mouth twice a day, and Prednisone dose pack once a day as ordered."  (*Id.*).  Plaintiff does not dispute these facts.  (Doc. 81 ¶ 17).

### 2.    Plaintiff's Alleged Kidney Stone Problems

In his amended complaint, Plaintiff alleges that on June 25, 2011 he suffered a kidney stone attack at 4:30 a.m. and was allowed "to lie writhing in pain on the hard hallway floor for over an hour" before "Evans, who was not on duty," was called, but she instructed the Jailers  "not to transport Plaintiff to the Hospital and to put him in isolation." (Doc. 21-2 at 20).  After Jailer Barton observed "Plaintiff writhing in pain

23

on the floor and sweating profusely," he "called for an ambulance at approximately

5:40 am[,] . . . [but because the] ambulance did not arrive for 45 minutes[,] . . . .

Plaintiff was allowed to lie in the Jail hallway floor for over two (2) hours unattended

and in the most acute physical pain a male human being can experience." (*Id.*). In his

Consolidated Response, however, Plaintiff alleges that he was left lying in his cell for

twelve hours in pain with a kidney stone, and one of his fellow inmates reported on the

cell intercom that Plaintiff was dying, but the inmate was told to ignore Plaintiff

because "[t]he nurse says he does it all the time. He is just putting on." (Doc. 78 at

21).

The Medical Defendants do not respond directly to these allegations. They state

that Plaintiff came to the FCDC infirmary (1) on June 5, 2011, with a report of kidney

pain, and after a thorough examination, during which Plaintiff "reported he was no

longer in pain," the SHP medical staff "concluded there was no problem"; (2) on June

27, "after complaining of excessive and painful urination[, and he] was assessed by the

medical staff" and prescribed "oral antibiotics of Cipro for fourteen (14) days"; and (3)

on June 29, when he complained of "continued pain in urination" but "stated he was

feeling better." (Doc. 63-7 ¶¶ 15, 18-19). Plaintiff denies the statement about the June

5 visit but admits that the remaining statements are true. (Doc. 81 ¶¶ 15, 18-19). The

24

Medical Defendants state that Plaintiff was examined by a physician on or about July 11 and again on or about July 13 for complaints of continued pain during urination and complaints of kidney pain. (Doc. 63-7 ¶¶ 21-22). Plaintiff denies these statements. (Doc. 81 ¶¶ 21-22).

### 3.   Plaintiff's September 10, 2011 Visit To FCRH For Back Pain

[Plaintiff alleges that o]n Saturday September 10, 2011, after suffering three (3) days [while] incapacitated in bed from intense back pain and begging the Jailers and . . . Evans continuously to transport him to the local hospital for treatment and pain relief, Jailer Jill Huffman had Plaintiff transported to [FCRH], but (at the insistence of . . . Newman) only after Plaintiff's wife and sister agreed to pay for [the] hospital trip and treatment, as required by one or more of the Defendants.

(Doc. 21-2 ¶ 27). Plaintiff alleges that attending hospital physician "Dr. Turner gave Plaintiff injections of Phenergrin, Demerol and Decardon for the back pain. [She] also diagnosed gout in Plaintiff's right foot, knee and left shoulder. . . . [and] recommended an immediate follow up MRI or CT scan to determine the current condition of Plaintiff's L-4 disk," which Defendants never scheduled. (*Id.* ¶ 29). Dr. Turner prescribed three medications, which Plaintiff's wife brought to the FCDC on September 10 and which he was given at 12-hour intervals rather than the prescribed 6-hour intervals until Queen and McMunn intervened on September 12 to stop the medication altogether because there was no verifying medical evidence, such as an

25

MRI or CT scan, to warrant the pain medication.  (*Id.* ¶¶ 32-33).

The Medical Defendants state that Plaintiff was taken to FCRH on September 10 for complaints of low back pain, where Dr. Turner "treated [him] non-emergently with Demerol (for pain), Phenergan (for nausea), and Decadron 8mg and released him in stable condition."  (Doc. 63-7 ¶ 35).  Dr. Turner prescribed "Robaxin 750mg by mouth four times per day as needed, Ultram 50mg by mouth every six hours a day as needed, and Prednisone 20mg by mouth twice a day for 7 days. According to the medication administration record, Robaxin 750mg by mouth was written as 750mg and given every a.m. (one a day), Prednisone was written as 10mg and given by mouth every a.m. (once a day), and Ultram was not recorded."  (*Id.*).  Plaintiff admits these statements to be true.  (Doc. 81 ¶ 35).

### 4.   Plaintiff's September 26, 2011 Visit To FCRH

Plaintiff alleges that on September 26, 2011, he fell and hit his head, knocking him "out cold," and he was taken to FCRH after being informed that he would have to pay for the trip unless hospital doctors found something wrong with him.  (Doc. 21-3 at 40).  He was diagnosed with elevated blood pressure and a knot on the back of his head and recommended for a neurological exam, which he did not receive before his October 7 release from FCDC.  (*Id.* ¶ 40).  Plaintiff notes that the videotape that shows

26

him collapsing in his pod before being transported to FCRH also shows a deputy

arriving without checking his vital signs or covering him with a blanket.  (Doc. 78 at

18).  Plaintiff also alleges that when he was in isolation for observation, on this or on

a separate occasion, it not being clear from his allegations, he fell off his bed onto the

floor and "[t]wo deputies came in  [and] took his mat and left him lying on the floor,"

although he does not indicate when this happened.  (*Id.* at 17).

The Medical Defendants state that Sergeant Burrell called Evans on September

26 and reported that Plaintiff "was lying on the floor in his dorm."  (Doc. 63-7 ¶ 38).

> On assessment, [Plaintiff] was awake, alert, and orientated x3 (person,
> place, and time) but was unable to get up off the floor.  [Plaintiff] was
> transferred by EMS to [FCRH] where he was evaluated by Dr. Michael
> Mudrey[, who] diagnosed [Plaintiff] with high blood pressure and a
> contusion  [and]  discharged  [him]  with  a  prescription  for  Mobic
> (Meloxicam - nonsteroidal anti-inflammatory drug for treatment of pain
> and inflammation).   On return to [the FCDC, Plaintiff] agreed to take
> Naprosyn for pain instead of Mobic, as Mobic had to be ordered outside
> the  pharmaceutical  formulary.   According  to  the  medical  records,
> [Plaintiff] complained of a headache and was a little sore but otherwise
> was okay.

(*Id.*).  The Medical Defendants state that on September 28, Plaintiff "walked unaided

to booking without complaints, stating he 'felt a lot better.'  That day, [his] blood

pressure is 116/72, pulse 76, respirations 18, with an oxygen saturation of 97%.

According  to  the  medical  records,  [Plaintiff]  tolerated  the  Naprosyn  without

gastrointestinal upset and he requested to move back into the general population." (*Id.* ¶ 39).  Plaintiff admits these statements to be true.  (Doc. 81 ¶¶ 38-39).

### 5.  **Analysis**

Other than his own testimony, Plaintiff has provided in support of his allegations only an affidavit from an alleged fellow prisoner, Max Jones, who states that while incarcerated at the FCDC "he observed Plaintiff . . . falling with back problems, . . . hav[ing] visible allergic reaction[s] on several occasions, . . . using the intercom to call for help because of various medical problems," with no response, and "on at least one occasion [he] witnessed [Plaintiff] writhing in the dorm floor with kidney pain and asking the jailers to help him."  (Doc. 78-2 at 2).  Jones states that when he asked the jailers to help Plaintiff he "was told that [Plaintiff] was always putting on and pretending to be hurt, and that he . . . should ignore . . . Plaintiff."  (*Id.* at 2-3).  Affiant also states that at least once he observed Plaintiff fall in the dorm, and when the Deputy arrived he "never checked on" Plaintiff's physical condition but "simply stood by until the EMTs arrived."  (*Id.* at 3).

Plaintiff has provided no other evidence to corroborate his claims that he was allowed to lie on the floor writhing in pain for hours at a time before being transported to the hospital or receiving any treatment at all.  Jones's affidavit provides no specifics

28

regarding dates and times, making it almost impossible to match his description of events with Plaintiff's, especially in light of Plaintiff's own tendency to describe events without providing dates and sometimes to provide differing versions of the same alleged event, as he has done regarding his alleged kidney stone attack in June 2011.

Plaintiff describes four trips to the hospital between June and September 2011. Plaintiff claims he lay "in the floor moaning for several hours" with back pain before being taken to the hospital on June 17, although he agrees with the Medical Defendants' explanation that in response to a telephone message from Queen, Evans first ordered that Plaintiff be given pain medication for his back and then ordered that he be taken to FCRH when his complaints of pain did not subside, and that upon his return to the FCDC Plaintiff received the medications prescribed by Dr. Turner, his FCRH attending physician. *See supra* Sect. II. D. 1; (*see also* Doc. 71-2 at 47).

Plaintiff alleges that he suffered horrible pain as a result of a kidney stone before being taken to FCRH on June 25, 2011, although there is no record of such a visit. Plaintiff also presents two different versions of this event, stating in the first version, in his amended complaint, that he lay on the floor for two hours before being taken to FCRH (which included 45 minutes waiting for the EMTs to arrive after they were

called) and stating in the second version, in his Consolidated Response, that he lay on the floor for twelve hours, although he does not mention a hospital visit in this version. *See supra* Sect. II. D. 2.  Plaintiff has offered no medical evidence that he suffers from kidney stones.  All tests to that effect appear to be negative.  (*See* Doc. 71-2 at 67-69). Plaintiff also acknowledges that he told medical personnel at the FCDC on June 29, 2011 that although he was still having pain and "not moving water," he was "feeling better."  (*See id.* at 16).  These allegations simply do not state a genuine issue for trial regarding the alleged deliberate indifference of the Medical Defendants or of anyone else at the FCDC to Plaintiff's alleged kidney stone pain.

With regard to Plaintiff's trip to FCRH for lower back pain on September 10, 2011, there is no medical evidence that Plaintiff's back condition was a serious medical need, as explained above with respect to Plaintiff's claim about the discontinuation of his prescribed medication by McMunn.  Dr. Turner at FCRH observed Plaintiff on September 10 to be in "no acute distress" and characterized his condition as "non-emergent."  *See supra* Sect. II. C. 4.  Although the discontinuation of the pain and anti-inflammatory medications upon Plaintiff's return from FCRH is questionable, that decision is a judgment call that is best left to the medical providers at the FCDC and not to the courts.  *See Thigpen*, 941 F.2d at 1504-05.  Finally, with

30

respect to Plaintiff's last trip to FCRH on September 26, 2011, after he passed out and hit his head, Plaintiff acknowledges that the Medical Defendants' description of the events is correct. *See supra* Sect. II. D. 4. Because the Medical Defendants describe an entirely reasonable response to the situation, Plaintiff has failed to make out a claim of deliberate indifference based on this incident.

Plaintiff also alleges in his amended complaint that he suffered from a "constant rash on his body and limbs" (Doc. 21-3 ¶ 41), and he describes an incident when he allegedly had a severe allergic reaction to a Hot Fry, from which he might have died without the Benadryl that Evans ordered he not be given, but which Sergeant Burrell gave him anyway (*id.* ¶ 39). Plaintiff has provided no evidence to support these allegations, and the medical records that the Medical Defendants have provided belie these claims. For example, Plaintiff's medical requests in June and July 2011 concerned mainly his alleged kidney problems (*see* Doc. 71-2 at 13-23), and when he mentioned on July 18, 2011 that his "allergies ha[d] gone crazy (headach[e]) sore throat" (*id.* at 20), he apparently received allergy medication, about which he complained on July 23 that it was "not working" (*id.* at 22). On July 25, 2011, he submitted a medical request, stating: "Still having allergic problems having dizzy spells one yesterday again this morning. Having back pain. It could be my blood

31

pressure." (*Id.* at 23).  These medical requests do not describe serious medical needs, and with respect to his alleged severe allergic reaction to a Hot Fry, there is no supporting medical evidence in the record and no statement or testimony from Sergeant Burrell to support Plaintiff's claim.

In sum, because the Medical Defendants have properly supported their motion for summary judgment, Plaintiff must "come forward with specific facts showing that there is a *genuine issue for trial*," *Bailey*, 284 F.3d at 1243 (internal quotations omitted), i.e., he "must come forward with significant, probative evidence." *Chanel, Inc.*, 931 F.2d at 1477. "[C]onclusory assertions . . . [without] supporting evidence are insufficient to withstand summary judgment." *Holifield*, 115 F.3d at 1564 n.6. Plaintiff has failed to provide the necessary supporting medical evidence.  Moreover, as noted above, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible." *Cuesta*, 285 F.3d at 970 (internal quotations omitted).  Frankly, it is implausible that the Medical Defendants would provide Plaintiff with the vast array of prescription medications that they made available to him during the course of his stay at the FCDC, only to deny him simple over-the-counter medications like Ibuprofen or Benadryl to alleviate Plaintiff's allegedly excruciating pain or

32

life-threatening allergic reactions.

   **E.    Plaintiff's Allegations Regarding Weight Loss, Bleeding Ulcers, Panic Attacks And Falsified Blood Pressure Readings Also Fail To State A Genuine Issue For Trial.**

   Plaintiff alleges that he lost thirty pounds while incarcerated at the FCDC.  (Doc. 21-3 ¶ 41; *see* Doc. 78 at 11-12).  He alleges that McMunn and others retaliated against him for "the increased requests for medical treatment and informal and formal complaints by Plaintiff and other inmates and in an apparent effort to hold down medical costs." (Doc. 21-3 ¶ 57; *see id.* ¶¶ 58-63).  Plaintiff alleges that Evans ignored his bleeding ulcers even though they were causing him to spit up blood (Doc. 78 at 21) and falsified his medical records to make it appear that his blood pressure had been monitored more frequently than it actually was (*id.* at 22).  He also states that he suffered multiple panic attacks while at the FCDC.  (*Id.* at 23).  He does acknowledge that Evans gave him Ibuprofen for his migraine headaches.  (*Id.* at 22).

   The Medical Defendants report Plaintiff's weight as 214 pounds on September 24, 2010 and 220 pounds on September 29, 2011 (Doc. 63-7 ¶¶ 10, 40), and Plaintiff admits these reports to be accurate (Doc. 81 ¶¶ 10, 40).  In other words, Plaintiff's claim that he lost 30 pounds while at the FCDC due to his severe health problems appears to be blatantly false.  Plaintiff has provided no verifying medical evidence to

33

support his remaining claims, which therefore fail to state a genuine issue of material fact for trial.  *See supra* Sect. II. D. 5.

**F.** **Plaintiff Has Failed To State A Claim Against The Sheriff's Office Defendants**

In his amended complaint, Plaintiff alleges that on June 17, 2011, his "back went out" and even after he "had lain in the floor moaning for several hours, . . . the Sheriff, Captain Greg Newman (Chief Jailer) and the on-duty Jailer demanded that Plaintiff pay for his own medical care" at FCRH before being transported there, to which demand he reluctantly agreed because he had received no care at the FCDC.  (Doc. 21-2 ¶ 14).  Plaintiff alleges that Shift Sergeant Jack Queen denied Plaintiff access to the medications prescribed at FCRH, which his wife brought to the FCDC.  (*Id.* ¶¶ 15-16). Plaintiff alleges that "Defendants Newman and Queen refused to give Plaintiff Benadryl, the commonly used over-the-counter antidote to . . . allergic reactions, even though Benadryl was on hand at the Jail, but sadistically denied Plaintiff Benadryl and allowed [Plaintiff's] allergic reactions . . . to cause [him] to break out in hives, to have alternating cold chills and hot sweats, to hyperventilate and to suffer great difficulty in breathing."  (*Id.* ¶ 18).  Plaintiff claims that on September 10, 2011, after he had begged FCDC staff for three days to take him to the hospital for his back pain, Jailer

34

Huffman arranged for his transport, but only after, at Newman's insistence, Plaintiff's wife or sister agree to pay for the trip. (*Id.* ¶ 27). Plaintiff alleges that Queen denied him his medications on the morning of September 12, 2011. (*Id.* ¶ 32).

Plaintiff further alleges that when he hit his head and was rendered unconscious on September 26, 2011, Newman instructed Shift Sergeant Burrell to tell Plaintiff that "unless the doctors at [FCRH] determined there was something medically wrong with Plaintiff, [he] would have to pay this bill, and the Jail would not be responsible for the cost of this trip to the Hospital." (Doc. 21-3 ¶ 40). In sum, Plaintiff alleges in his amended complaint that the Sheriff's Office Defendants made every effort to reduce the cost of his medical care by substituting generic or other medications for his prescribed medications and by requiring him to pay for his trips to the hospital unless the trips were justified for medical reasons, and that Kirby and Newman "otherwise instituted a systematic program of inept and inadequate medical care at [the FCDC] aimed at reducing medical costs . . . without any regard whatsoever for the health and welfare of [FCDC] inmates." (*Id.* ¶ 57 *et seq.*).

In response to the Sheriff's Office Defendants' Statement of Material Facts (Doc. 64-1), Plaintiff agrees that "all of the medical decisions about Plaintiff's medical care at the Jail were made at the direction of medical professionals under Southern

Health Partners" and that "[t]he only possible exceptions known to Plaintiff are: (a) the four occasions when Plaintiff was sent to [FCRH] from the Jail, for which Plaintiff does not know whether the SHP nurse was called or consulted, Long Dep. at 81; and (b) an occasion where an officer provided Benadryl to Plaintiff even though the nurse allegedly directed no Benadryl.  Long Dep. at 182."  (Doc. 64-1 ¶¶ 12-13; *see* Doc. 80 ¶¶ 12-13).

After stating in his Consolidated Response that he is suing Kirby and Newman in this action for their personal actions as supervisors, Plaintiff asserts that

> Kirby had personal knowledge of [his] medical condition and the problems with his medication.  He personally spoke to Plaintiff's wife and his sister on the failure to provide proper medicine timely and the medical conditions causing Plaintiff extreme pain.  He personally saw Plaintiff during one of his attacks with his back, and ask[ed him] if he needed to go to the hospital every time he had problems with his back.

(Doc. 78 at 37).  Plaintiff continues that he "has testified that he complained to Newman about Queen and about the mistreatment by the inmates. Newman is also responsible for Plaintiff being known as an informer."[6]  (*Id.* at 38).  Plaintiff speculates

---

[6]Plaintiff is referring to his allegations that Queen incited and/or permitted the harassment of Plaintiff by his fellow inmates because Plaintiff was an accused child molester and that Newman contributed to the harassment by attempting to gather information from Plaintiff about possible wrongdoing at the FCDC.  (*See* Doc. 78 at 1-4, 8-10, 41-43).  As Plaintiff failed to raise these allegations in his amended complaint and also failed to seek permission to amend his complaint a

that when Newman "was going around the jail, [he] had to have seen Plaintiff on the floor in pain, but did nothing." (*Id.*).

Plaintiff states that his "claims in this case involved Sheriff Kirby's policy of providing medical care only to inmates who have money on the books and the requirement of a co-pay." (*Id.* at 39). Plaintiff alleges that this policy caused his prescription medication to be denied or delayed and delayed his hospitalization "until he agreed to be responsible for the costs." (*Id.* at 40). Plaintiff alleges that, as he testified in his deposition, the FCDC deputies ignored his pleas for help on the "numerous days when he had to l[ie] on the cell floors because he was in so much pain that he couldn't move." (*Id.* at 43).

---

second time to add claims based on these allegations, the Court need not address them here. (*See* Doc. 83 (Sheriff's Office Defendants' Reply) at 3-5 (citing "*Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (refusing to entertain claim not raised in complaint and stating, 'Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint.'); *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004) (dismissing claims not raised in complaint but disclosed over the course of discovery)[, *abrogated on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456-57 (2006)]; *Welch v. Delta Air Lines, Inc.*, 978 F. Supp. 1133, 1138 (N.D. Ga. 1997) ('Plaintiff cannot change its theory of the case (in an effort to avoid summary judgment) *after* Defendant moves for summary judgment.')")). In *Gilmour*, the Eleventh Circuit noted, "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour*, 382 F.3d at 1315. In *Cooper*, in affirming summary judgment for all defendants, the Eleventh Circuit stated, "Any claims not asserted in the plaintiff's Complaint are properly dismissed." *Cooper*, 390 F.3d at 732 (citing *Coon v. Ga. Pac. Corp.*, 829 F.2d 1563, 1568-71 (11th Cir. 1987)).

37

Because there is no genuine issue of material fact for trial on Plaintiff's claims of deliberate indifference to a serious medical need, the Sheriff's Office Defendants cannot be held liable in this action for deliberate indifference.  Moreover, Plaintiff acknowledges that the Sheriff's Office Defendants made no decisions about Plaintiff's medical treatment except as to whether he would be taken to FCRH without first agreeing to pay his own expenses. (*See* Doc. 64-1 ¶¶ 12-13; *see* Doc. 80 ¶¶ 12-13); *see also Williams v. Limestone County*, 198 Fed. Appx. 893, 897-98 & n.5 (11th Cir. 2006) (affirming summary judgment in favor of county sheriff on plaintiff's deliberate indifference claims in part because "supervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care," and noting that because the plaintiff failed to establish deliberate indifference it was not necessary for the court to address the issue of the sheriff's qualified immunity).

The Sheriff's Office Defendants argue that under the United States Constitution Plaintiff is entitled to medical care but not to free medical care. (*See* Doc. 64-2 at 12-13). This argument does not appear to be well-supported. *See, e.g., Weaver v. Mobile County*, 228 Fed. Appx. 883, 886 (11th Cir. 2007) (rejecting challenge to county jail's standard operating procedure ("SOP") requiring prisoners to make ten dollar co-pay before receiving medical treatment because "[a]lthough the SOPs state that a ten dollar

co-pay is due for *non-emergency* treatment, they also provide that there is *no* charge for *emergency* care[,] and "an inmate with insufficient funds for non-emergency care is not denied treatment, but simply incurs negative balance in his inmate account"). Plaintiff's claim regarding the payment arrangements for his hospital visits still fails. Plaintiff has pointed to no medical evidence of record creating a genuine issue for trial that a delay, if any, caused by the Sheriff's Office Defendants' insistence that Plaintiff pay for one or more of his hospital visits caused Plaintiff any medical harm.  *See Lee*, 405 Fed. Appx. at 458-59 ("An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." (internal quotations omitted)).  With respect to his September 10, 2011 hospital visit, for example, Dr. Turner noted that Plaintiff's "condition was non-emergent," i.e., that he did not require urgent care.  (Doc. 71-8 at 47).[7]

Finally, as noted above, *see supra* n.6, Plaintiff may not raise new, unrelated

---

[7]When asked at his deposition what harm resulted from the delays allegedly caused by the Sheriff's Office Defendants insisting that he pay his hospital bills—"For all those occasions, put them all together, were you harmed on any occasion on account of an officer telling you you're going to have to pay for it?"—Plaintiff responded not with a description of a worsening medical condition but by stating, "The reason being . . . it harmed me—it really pissed me off, first of all, and you may say that's no harm. Mentally I'm there and my wife has always had my income. She don't have that income anymore."  (Doc. 69-1 at 1-3 (Long Dep. at 42-44)).

AO 72A
(Rev.8/82)

claims in his Consolidated Response, nor may he base his claims on mere speculation as to what the individual Sheriff's Office Defendants might have known. *See Oretsky v. Infinity Ins. Co.*, 524 Fed. Appx. 517, 522 n.3 (11th Cir. 2013) ("the non-moving party cannot create a genuine issue of material fact through speculation or evidence that is merely colorable or not significantly probative" (internal quotations omitted)).

## III.   Conclusion

For the foregoing reasons, Plaintiff has not demonstrated the existence of a triable issue of material fact with regard to his deliberate indifference claims, which should be dismissed as a matter of law. *See Cuesta*, 285 F.3d at 970; *Bailey*, 284 F.3d at 1243; *Chanel, Inc.*, 931 F.2d 1477.

**IT IS RECOMMENDED** that Evans and McMunn's Motion for Summary Judgment (Doc. 63) and Kirby, Newman and Queen's Motion for Summary Judgment (Doc. 64) be **GRANTED** and that this civil action be **DISMISSED**.

The Clerk is **DIRECTED** to withdraw the reference to the Magistrate Judge.

**SO RECOMMENDED and DIRECTED** this 18th day of February, 2014.

 /s/ *J. CLAY FULLER*
J. CLAY FULLER
United States Magistrate Judge

40